IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| MELVIN K. CHANG, M.D., | CIVIL NO. 12-00617 DKW-RLP |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| STRAUB CLINIC & HOSPITAL, INC., et al. | |
| Defendants. | |

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Before the Court is Defendant Straub Clinic and Hospital's

("Defendant" or "Straub") Motion for Summary Judgment ("Motion").   The Court

held a hearing on the Motion on October 25, 2013.   After careful consideration of

the supporting and opposing memoranda, the arguments of counsel, and the relevant

legal authority, the Court GRANTS the Motion.

## BACKGROUND

### I.   Plaintiff's Employment with Straub

Plaintiff Melvin K. Chang, M.D., was employed as a full-time primary care physician by Straub.   In 2005, Plaintiff "retired" from Straub and accepted a full-time position with the State of Hawaii, where he remains employed as a physician.   From August 2005 through March 2011, in addition to his duties with the State, Plaintiff continued to treat patients at Straub's Kaneohe Clinic as a "call-in" physician.   *See* Pl.'s Dep. Tr. at 28-50 (attached as Exhibit F to Leong Decl.).   According to Plaintiff, he had a regular schedule, seeing patients for a half day on every other Saturday.   He believed that he should have been classified as a "part-time" physician because he was never called in on an irregular basis or on short notice, and he never had the specific duties, schedule or job description of a "call-in" physician.   Chang Decl. ¶¶ 10-12.   According to Straub, Plaintiff was the only physician it employed with this atypical arrangement.   Gladstone Decl. ¶¶ 3-4.

Plaintiff alleges that in 2006, he advocated for Anne Topolinski, then the manager of Straub's Kaneohe Clinic, when her position was eliminated due to a reduction in force.   Topolinski, a sixty-year-old, part-Hawaiian woman, was transferred to a position with Straub's parent entity, Hawaii Pacific Health ("HPH"), where she remains currently employed.   Gladstone Decl. ¶¶ 6-8; Chang Decl. ¶ 13.

According to Plaintiff, he contacted Art Gladstone, Straub's Chief Operating Officer, by phone and email, questioning why Topolinski was not permitted to remain in her then-current position.   Chang Decl. ¶ 15.   Plaintiff sent Gladstone a June 25, 2006 memorandum, asking him to continue Topolinski's employment with Straub and opining that it "appears that HPH is driven solely by the financials and bottom-line[.]"   Pl.'s Ex. A (6/25/2006 Memorandum).   In a June 30, 2006 email to Gladstone and others, Plaintiff reiterated his view that the elimination of Topolinski's position "was a purely financial decision."   Pl.'s Ex. B (6/30/2006 email).

Plaintiff later advocated on behalf of another Straub employee, Susie Matagi, an x-ray technician who was terminated on September 6, 2007.   Plaintiff assisted Matagi, a forty-seven-year-old female of Samoan descent, with filing an internal grievance with Straub's Fair Treatment and Arbitration Process ("FTAP").   Chang Decl. ¶¶ 17-19.   Plaintiff asserts that, during the course of his advocacy for Matagi, he had "several unpleasant dealings with Ray Vara, Chief Executive Officer of Straub, and Art Gladstone, who appeared to have done an inadequate investigation prior to Matagi's termination."   Chang Decl. ¶ 21.   On November 5, 2007, Matagi was reinstated as a result of the FTAP and continues to work at Straub.   Chang Decl. ¶ 22.

According to Straub, even after Matagi's reinstatement, Plaintiff continued to send communications to Straub relaying his concerns regarding Straub's employment practices.   For instance, Plaintiff sent a forty-one page memorandum that he entitled, "Welcome Home Susie!!" to Chuck Sted, Chief Executive Officer of HPH, on November 15, 2007.   In Attachment 2 to the memorandum, Plaintiff lists "Key Issues and Questions to Review."   Among the questions listed is the following:

> 23.   Does someone in the Compliance Office evaluate for patterns of abuse or mistreatment of employees that may or may not be present?   Is Administration aware that the Straub grapevine is full of anecdotal stories of long-term employees being unfairly let go and that many employees are concerned about age and wage discrimination and punishment of those who challenge management?

Pl.'s Ex. H; Def.'s Ex. 11 at 155 (attached to Pl.'s Dep. Tr.).

Between 2007 and 2010, Plaintiff continued his part-time schedule at Straub's Kaneohe Clinic without incident.

## II.   <u>Plaintiff's Termination</u>

Plaintiff states that he avoided interacting with Straub CEO Vara following the events of 2007.   However, in November 2010, Vara greeted Plaintiff while attending the Physician's Recognition Dinner.   Plaintiff claims that he shook Vara's hand "without flinching or displaying any visible emotional reaction but I

4

literally felt sick."   Chang Decl. ¶ 27.   On November 17, 2010, Plaintiff sent Vara

an email in which Plaintiff "reminded [Vara] of his actions and handling of Susie

Matagi's 2007 termination, and advised him that I did not want to shake his hand

again unless he offered it to me with a genuine apology to myself and Susie Matagi."

Chang Decl. ¶ 27.   The email also advised Vara that Plaintiff chose not to perform

at Straub functions with the Physician's Band, of which he was a member, because --

> I didn't want to have to encounter you and have it degenerate
> into an unpleasant altercation which would be counter to the
> group's mission and goals of that event.   I tolerated your
> greeting at the 2009 Employee party but would have preferred
> not to shake your hand. . . .   I decided this year that we would try
> once more to help the physicians in the organization whatever
> my personal feelings are about you.   I thought I might get
> through the evening without having to interact with you but
> unfortunately it was not the case.

Pl.'s Ex. I (11/17/2010 email).

On February 24, 2011, Linda Cazinha, an HPH employee, telephoned

Plaintiff to ask whether the Physician's Band could perform at the next Straub

holiday party.   According to Plaintiff:

> I accepted the request, and upon learning from Cazinha that
> [former Straub employee, Kathy] Asato was still out looking for
> work, I lamented about how Asato appeared to have departed
> from the organization under involuntary circumstances as others
> before had experienced with the current administration.   I
> mentioned that I had assisted another employee who had been
> wrongfully terminated to be reinstated in 2007 without

mentioning her name.   We then moved on to discuss the budget, employee participation, and venue for the party, so that more employees could be included in the annual celebration.

Chang Decl. ¶ 28.   Cazinha recounted the conversation as follows:

> 3.    During the February 24, 2011 telephone call, without any prompting from me, Plaintiff made a number of comments disparaging Straub and its management, which I found to be very unprofessional.   My impression from the phone call was that Plaintiff was a very disgruntled employee who was very unhappy working for Straub.   Such comments by Plaintiff included words to the effect of:
>
>> "Ray Vara should take his big fat pay check and do something for the employees."
>>
>> "from time to time Ray has tried to shake my hand . . . finally I told Ray unless you have an apology for me then do not shake my hand and stay away from me."
>>
>> "the organization can spend thousands of dollars on a so called brain washing seminar why not take that money and do something nice for the employees like a Straub picnic or bigger Christmas party that the entire staff can attend."
>
> Plaintiff also complained about Straub "letting go" Kathy Asato, a former employee of Straub.
>
> 4.    Plaintiff's comments during the February 24, 2011 phone call made me very uncomfortable and I was extremely shaken up by the interaction.   I documented what was said in the February 24 phone call between me and Plaintiff in an email to Art Gladstone, Straub's Chief Operating Officer. . . .

Cazinha Decl. ¶¶ 3-4.   On March 2, 2011, Gladstone forwarded the email from Cazinha, recounting her February 24, 2011 telephone conversation with Plaintiff, to Randy Yates, Straub's Chief Medical Officer.   Yates had little prior history with Plaintiff when he reviewed the email, but was aware of Plaintiff's November 2010 email to Vara.   Yates Decl. ¶¶ 2, 4.   Yates determined that Plaintiff's conduct violated various Straub employee policies, including Straub's House Rule 22, Section 1.1 of the Straub Physician's Manual, and the Straub Physician's Manual Professional Standards regarding Collegiality/Groupmanship.   Yates Decl. ¶ 3.

According to Yates, at the time he reviewed Cazinha's March 2, 2011 email, he was not aware of Plaintiff's call-in employment arrangement with Straub and believed him to be functioning as an independent physician.   When alerted to Plaintiff's employment status, Yates determined that Plaintiff's arrangement with Straub did not fall within the parameters of a normal "call-in physician" position. Yates Decl. ¶¶ 5-6.   Yates stated that, in light of Plaintiff's atypical call-in arrangement, "his inappropriate conduct during his telephone conversation with Ms. Cazinha, and his past inappropriate actions with Mr. Vara, I determined that Plaintiff's employment should be terminated.   I concluded that plaintiff had a deep-seeded [sic] animosity against Straub, in particular its CEO, Ray Vara." Yates Decl. ¶ 7.

On March 18, 2011, Plaintiff met with Yates.   Plaintiff tape-recorded the meeting without Yates' knowledge.   Chang Decl. ¶ 31.   Yates told Plaintiff that his employment with Straub was terminated, and, according to Plaintiff, Yates made no attempt to hear Plaintiff's side of the story.   Chang Decl. ¶ 32.   According to Yates, Plaintiff showed no remorse for his comments to Cazinha.   When Yates told Plaintiff that he felt Plaintiff was going to "throw darts and try to burn [the organization] down," Plaintiff responded with, "I'll do what I feel is necessary." Yates Decl. ¶ 9.

Yates informed Plaintiff that he could file a grievance through the Physician's Advisory Group ("PAG"), and that if PAG recommended overturning Plaintiff's termination, Yates would follow that recommendation.   Yates Decl. ¶ 10.   Plaintiff elected to file such a grievance, but the PAG upheld Yates' termination decision, and the PAG decision itself was affirmed when Plaintiff elected to proceed to Step 2 of his grievance.   Chang Decl. ¶¶ 43-44.

Plaintiff simultaneously pursued a claim that his termination violated the National Labor Relations Act.   *See* Def.'s Ex. 21 (attached to Pl.'s Dep. Tr.). In a June 2011 filing with the National Labor Relations Board, Plaintiff alleged that he had been retaliated against "for protected speech and my protected concerted activity in 2007[.]"   Def.'s Ex. 36 (attached to Pl.'s Dep. Tr.).   According to

Plaintiff, he "was advised that because my advocacy was in 2006 and 2007, there was too long a gap before my termination.   I withdrew my claims upon [receiving] this information."   Chang Decl. ¶ 47.

On August 18, 2011, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), asserting race and age discrimination, and retaliation.   Def.'s Ex. 23 (attached to Pl.'s Dep. Tr.). The EEOC issued a "no cause" determination and Right to Sue Letter on July 23, 2012.   Def.'s Ex. I (7/23/12 EEOC letter).   Plaintiff filed a timely complaint in state court on October 15, 2012, which Defendant removed to this Court on November 19, 2012.

Plaintiff's Complaint contains two claims.   Plaintiff's first claim alleges termination "in retaliation for his opposition to Straub's discrimination of older minority women who were employed by Straub."   Complaint ¶ 23. Plaintiff's second claim alleges intentional infliction of emotional distress ("IIED"), arising out of his alleged wrongful termination.   *Id*. ¶ 24.   Defendant seeks summary judgment on both claims.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## DISCUSSION

## I.   Retaliation

The parties agree that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to Plaintiff's retaliatory termination claim.   *See McGinest v. GTE Service Corp.,* 360 F.3d 1103, 1122 (9th Cir. 2004); Def's Mem. at 20-21; Pl's Mem. in Opp. at 14-15.   The *McDonnell Douglas* framework applies whether Plaintiff couches his termination claim as a violation of Title VII, 42 U.S.C. § 2000e–2(a), the Age Discrimination in Employment Act, 29 U.S.C. § 623 ("ADEA"), or Hawaii Revised Statutes ("HRS") § 378-2.   *See Shelley v. Geren*, 666 F.3d 599, 607-08 (9th Cir. 2012) (noting that the *McDonnell Douglas* burden-shifting framework applies to ADEA claims evaluated in the context of a summary judgment motion); *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) (applying *McDonnell Douglas* framework to Title VII case); *Hac v. Univ. of Hawaii*, 102 Hawaiʻi 92, 101, 73 P.3d 46, 55 (2003)

10

("This court has adopted the *McDonnell Douglas* analysis in HRS § 378-2 discrimination cases.").

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must show that (1) he or she engaged in a protected activity; (2) the defendant took an adverse action against him or her; and (3) there was a causal link between his or her involvement in the protected activity and defendant's adverse personnel action. *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006).   Once a plaintiff succeeds in presenting a prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its employment decision.   *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007).   "Should the defendant carry its burden, the burden then shifts back to the plaintiff to raise a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination."   *Id.*

A.      **Plaintiff Fails to Establish Prima Facie Case**

Plaintiff fails to meet his burden with respect to the first and third prongs of a prima facie case for retaliation.   First, Plaintiff fails to raise a triable issue of fact that he engaged in protected activity.   "Title VII's statutory 'opposition clause' prohibits an employer from retaliating against an applicant or employee 'because he has opposed any practice made an unlawful employment practice,'" such as discrimination based on race, gender, religion, or national origin.   *E.E.O.C.*

*v. Luce, Forward, Hamilton & Scripps*, 303 F.3d 994, 1005 (9th Cir. 2002) (citing 42 U.S.C. § 2000e–3(a)); *see also Silver v. KCA, Inc*., 586 F.2d 138, 142 (9th Cir. 1978) ("[U]nder the clear language of the 'opposition' clause . . . a case of retaliation has not been made out unless the 'retaliation' relates to the employee's opposition to a [Title VII] violation.").   None of Plaintiff's conduct involves such "protected" activity.

Plaintiff contends that he engaged in the necessary protected activity when he opposed "Straub's intent to terminate certain older minority female employees such as [Topolinski] and Matagi."   Mem. in Opp'n at 26.   Plaintiff, however, did not oppose their terminations *because of* their race, age or gender, or *because of* any other protected category.   Rather, Plaintiff himself described Straub's treatment of Topolinski as a "purely financial decision," not as discriminatory.   Pl.'s Ex. B (6/30/2006 Email); *see also* Pl.'s Ex. A (6/25/2006 Memorandum) (Straub's decision was "driven solely by the financials and bottom line.").   Indeed, Plaintiff admitted that he had no idea whether either Topolinski or Matagi had been subjected to discriminatory treatment of the sort prohibited by Title VII.   Pl.'s Dep. Tr. at 294-295, 302.

The only "evidence" of Plaintiff's opposition to discrimination is buried within Plaintiff's November 2007 forty-one page, single-spaced

memorandum to Straub regarding the Matagi matter, in which he lists forty "Key

Issues and Questions to Review," including the following:

> 23.    Does someone in the Compliance Office evaluate for
> patterns of abuse or mistreatment of employees that may or may
> not be present?   Is Administration aware that the Straub
> grapevine is full of anecdotal stories of long-term employees
> being unfairly let go and that many employees are concerned
> about age and wage discrimination and punishment of those who
> challenge management?
> . . . .
> 37.    . . . .   Were issues such as wrongful termination with age,
> wage, sex and racial bias discussed in reevaluating this case?

Pl.'s Ex. H; Def.'s Ex. 11 at 155, 159 (attached to Pl.'s Dep. Tr.).   Nowhere in this

document or in any of Plaintiff's many submissions to Straub does Plaintiff claim

that Matagi's termination was the result of age or any other form of discrimination.

The vaguely-worded questions presented by Plaintiff are insufficient to convey to

Straub that Plaintiff was complaining about unlawful discrimination generally or

regarding Matagi specifically.   *See Guerrero v. Haw.*, 662 F. Supp. 2d 1242, 1260

(D. Haw. 2009) (finding no protected activity where "Plaintiff's letter . . . was

unrelated to [defendant's] alleged discriminatory practices.   The letter, therefore,

cannot be characterized as protected activity because the activity about which he

complained . . . is not prohibited by Title VII."); *see also Mendoza v. Kindred

Healthcare Operating, Inc.*, 2012 WL 2055007, at *12 (N.D. Cal. June 5, 2012)

("An employee's comments, when read in their totality, must oppose discrimination. On the other hand, employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct . . . where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination.   Moreover, complaints about personal grievances or vague or conclusory remarks that fail to put employer on notice as to what conduct it should investigate will not suffice to establish protected conduct.") (citations and quotation marks omitted).

Nor can Plaintiff satisfy the third prong of a prima facie case for retaliation—a causal link between his alleged protected activity in 2006-2007 and his termination by Yates in 2011.

First, the record indicates that more than three years separated Plaintiff's last alleged protected activity on behalf of Matagi in late 2007 and his termination in March 2011.   Accordingly, Plaintiff fails to demonstrate temporal proximity.   *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (noting that those cases that accept mere temporal proximity as sufficient evidence of causality to establish a prima facie case uniformly hold that temporal proximity must be "very close"); *Manatt v. Bank of Am.*, 339 F.3d 792, 802 (9th Cir. 2003) (refusing to draw an inference of causation when there was a nine-month period

between the employer's knowledge of protected activity and an adverse

employment action).

To close the temporal gap, Plaintiff has made vague assertions of a

"pattern of antagonism" that followed his alleged protective activity.   *See Porter v.*

*Cal. Dep't. of Corrections*, 419 F.3d 885, 895 (9th Cir. 2005) (holding that temporal

proximity alone is not determinative of causality); Mem. in Opp'n at 17.   But there

is no evidence of such antagonism, much less a pattern.   In fact, despite an

intemperate attitude towards Straub and its management, an attitude to which

Plaintiff readily admits, there is no dispute that Plaintiff was not subject to any

discipline, adverse action or other negative treatment by Straub between 2007 and

2010.

Finally, Plaintiff fails to raise an issue of fact regarding whether Yates

was even aware that Plaintiff engaged in purported protected activity.   *See Cohen v.*

*Fred Meyer, Inc*., 686 F.2d 793, 796 (9th Cir. 1982) (causation element requires

evidence that "employer was aware that the plaintiff had engaged in the protected

activity").   Yates became Straub's Chief Medical Officer in 2010 (Yates Decl. at

¶ 1), well after Plaintiff asserts that he opposed Straub's discriminatory practices.

There is no evidence that Yates knew of any allegations of discrimination brought

by Plaintiff before Plaintiff's 2011 termination, and, in fact, Yates denies it.   *See*

15

Yates Decl. at ¶ 12.   In sum, Plaintiff has not established a causal link between any protected activity and his termination, and accordingly, for this independent reason, he cannot make a prima facie case of retaliation.

**B.**     **Plaintiff Fails To Establish That Straub's Legitimate, Non-Discriminatory Reasons For Terminating Him Were Pretextual**

Even assuming that Plaintiff could establish a prima facie case of retaliation, Defendant has offered legitimate, non-discriminatory reasons for terminating Plaintiff: Plaintiff's unprofessional communications with Cazinha and Vara, in violation of Straub's code of conduct, and Plaintiff's atypical employment arrangement as a "call-in" physician working a half-day on every-other Saturday. Yates Decl. at ¶¶ 3-6.   If an employer provides a legitimate explanation for the challenged decision, the burden shifts back to the plaintiff to show that the employer's explanation is merely a pretext for impermissible discrimination.   *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).   The plaintiff needs to do more than merely deny the credibility of the defendant's proffered reasons.   *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986).   To survive summary judgment, the plaintiff must offer either direct or specific and substantial circumstantial evidence of retaliatory motive.   *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).   Plaintiff fails to do so here.

Although Plaintiff asserts that "Yates advised Chang that he was terminated in part due [to] his involvement in the human resources process, and the Matagi matter" (Mem. in Opp'n at 27), he offers no citation to any record evidence in support of this naked assertion. *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (plaintiff's "subjective personal judgments . . . do not raise a genuine issue of material fact"). To the contrary, Plaintiff, not Yates, raised the issue of Plaintiff's advocacy of Matagi during the March 18, 2011 termination meeting. Yates Decl. at ¶ 4. In his Declaration, Plaintiff states that:

> Yates additionally stated that I had interfered with Susie Matagi's situation, and my involvement almost resulted in her not being reinstated. Yates indicated that he was familiar with my 2007 "Welcome Home Susie" report, and that he had spoken to the decision makers in the Matagi matter prior to my immediate termination.

Chang Decl. ¶ 35. Plaintiff's own transcription of his secret recording of the March 18, 2011 meeting, however, shows that Yates consistently explained his decision to terminate Plaintiff based on Plaintiff's inappropriate communications and animosity. For example, Yates told Plaintiff:

> One of the employees [Cazinha] came to me with a concern that you had, uh, in a conversation with her regarding the Christmas Party that, first of all, belittled the organization tremendously which hurt her personally, and in addition to that, you had also disclosed some personal information regarding HR issues regarding a previous employee. That's not acceptable for

17

discussion.   So from that standpoint *** and that's why I have to let you go from Straub.

Pl.'s Ex. K (3/18/11 Meeting Tr.).   Yates also told Plaintiff that it was inappropriate

to discuss Matagi's 2007 employment dispute with Cazinha.

> Yates:     You're still talking about it!
>
> Chang:   Because I'm bringing it up because it's, it's appropriate to the context . . .
>
> Y:     You were bringing it up when you talked to an uninvolved employee who's involved in setting up the Christmas Party.
>
> C:     Who's involved in explaining why we may or may not do the gig.   Ok.
>
> Y:     That's inappropriate.
>
> C:     Well that's your opinion.
>
> Y:     No, no that's not my opinion!   That's inappropriate behavior by a physician or any other employee.   That's not appropriate to bring up somebody else's HR issue in a conversation to somebody like that.   You can bring it up with somebody in a leadership position.

Id.   Yates asked Plaintiff how he could justify his communications with Cazinha,

and Plaintiff responded "I didn't think I did anything wrong[,]" and "I didn't think I

did anything wrong, because, again it was in the uh, the whole context of it[,]" and

"I'll do what I feel is necessary to . . . ."   Id.

18

Yates confirmed portions of this conversation as follows:

3.      At the time of Plaintiff's termination from employment with Straub in March 2011, I had not read the question buried in Plaintiff's 41-page single-spaced "Welcome Home Susie" document that asks whether Straub administration was aware that "many employees are concerned about age and wage discrimination."   In fact, at the time of Plaintiff's termination, I was unaware of Plaintiff ever making any references to discrimination to any person (either in writing or verbally).[1]

4.      During the March 18, 2011 termination meeting with Plaintiff, it was Plaintiff who brought up his 2007 advocacy for Susie Matagi ("Matagi"), not me.   This is reflected in Plaintiff's transcription of our meeting, which I have reviewed.

5.      After Plaintiff brought up his 2007 advocacy for Matagi during the March 18, 2011 termination meeting, I asked Plaintiff "[w]hy do you focus and perseverate on something that's gone. . . ?"

6.      My only reference to Ms. Matagi during the March 18 termination meeting was telling Plaintiff that it was inappropriate to talk about HR issues of employees with uninvolved co-workers.   I told Plaintiff that he should instead raise any HR issues with management.

10/10/13 Yates Decl.   Even viewing Plaintiff's version of this conversation in the

light most favorable to Plaintiff and drawing all reasonable inferences in his favor, it

---

[1] Plaintiff does not dispute that Yates did not see the question referring to "age and wage discrimination."   At his deposition, Plaintiff stated that "I suspect that Dr. Yates probably would have missed it, because he admitted he had not read the report in detail."   Pl.'s Dep. Tr. at 158 (attached as Def.'s Ex. A-1).

is clear that Plaintiff was terminated based largely on his conversation with Cazinha, his revelation of private employee information to "uninvolved co-workers," his denigration of Straub and its management, and his atypical part-time arrangement which no other Straub physician enjoyed.   Because Plaintiff fails to point to either direct or circumstantial evidence of retaliatory motive, Plaintiff fails to raise a genuine issue of fact as to pretext.

Accordingly, the Court GRANTS the Motion with respect to Plaintiff's first claim.

## II.   **IIED**

Defendant seeks summary judgment on Plaintiff's claim for IIED on the ground that it is barred by Hawaii's workers compensation exclusivity provision, HRS § 386-5.   That statute provides:

> The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee, the employee's legal representative, spouse, dependents, next of kin, or anyone else entitled to recover damages from the employer, at common law or otherwise, on account of the injury, except for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto, in which case a civil action may also be brought.

HRS § 386-5.

*Yang v. Abercrombie & Fitch Stores*, 128 Hawai'i 173, 183, 284 P.3d 946, 956 (App. 2012), recently held that this exclusivity provision bars suits against employers for alleged injuries suffered because of a plaintiff's employment that were caused by the alleged willful acts of co-employees acting in the course and scope of their employment.   *See also Shahata v. W Steak Waikiki, LLC*, 494 Fed. Appx. 729, 731 (9th Cir. 2012) ("Except in cases of sexual harassment or abuse, the statute bars civil claims by an employee against his employer for negligent infliction of emotional distress arising from employment"); *Shim v. United Air Lines, Inc.*, 2012 WL 6742529, *6 n.5 (D. Haw. Dec 13, 2012) ("The IIED claim in Count Two independently fails because of Hawaii's workers compensation exclusivity provision.").   Tellingly, Plaintiff's opposition brief does not dispute that his IIED claim is barred by Hawaii's worker's compensation law.   The Court finds that Plaintiff's IIED claim (Complaint ¶ 24) is barred by HRS § 386-5.

Plaintiff's IIED claim also fails on the merits.   A claim for intentional infliction of emotional distress requires the plaintiff to show that the defendant intentionally or recklessly engaged in a harmful act that was outrageous and caused extreme emotional distress.   *Young v. Allstate Ins. Co.,* 119 Hawai'i 403, 429, 198 P.3d 666, 692 (2008).   Outrageous conduct is "conduct exceeding all bounds usually tolerated by decent society and which is of a nature especially calculated to

cause . . . mental distress of a very serious kind."   *Hac v. Univ. of Haw.*, 102

Hawaiʻi 92, 73 P.3d 46, 60-61 (2003); *Bragalone v. Kona Coast Resort Joint*

*Venture*, 866 F. Supp. 1285, 1294 (D. Haw. 1994), *citing, Lapinad v. Pacific*

*Oldsmobile-GMC, Inc*., 679 F.Supp. 991, 996 (D. Haw.1988) (to sustain an

emotional distress claim in an employment discrimination case, employer must

engage in some conduct which goes beyond merely firing an employee for what are

seen as unfair reasons).   Viewing the evidence in the light most favorable to

Plaintiff, Defendant did not engage in "outrageous" conduct of the sort necessary to

maintain an IIED claim under Hawaiʻi law.   Accordingly, the Court GRANTS the

Motion with respect to Plaintiff's second claim.


//               //


//               //


//               //


//               //

## <u>CONCLUSION</u>

On the basis of the foregoing, the Court GRANTS Defendant Straub Clinic and Hospital's Motion for Summary Judgment.   The Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAIʻI, January 7, 2014.



Derrick K. Watson
United States District Judge

-------------------------------------------------------------------------------------------------------------------------
<u>Melvin K. Chang, M.D. v. Straub Clinic & Hospital, et al.;</u>
CV 12-00617 DKW-RLP; ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

23